# Exhibit 8

Declaration of Shirene Hansotia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| JEANNE VOLTZ-LOOMIS; GARY ZACHARIAH THOMAS; DENISE EDGAR; HERBERT PALMER, JR.; BRANDON MOORE; ALLEN SLAUGHTER, JR.; GAY OPEL STANLEY; Brison AKEEM Allison, on their own and on behalf of a class of similarly situated persons;<br>*Petitioners*,<br>v.<br><br>HENRY McMASTER, in his official capacity as Governor of the State of South Carolina; BRYAN STIRLING, in his official capacity as Director of the South Carolina Department of Corrections; the South Carolina Board of Pardons and Paroles; and Christopher F. Gibbs, Mollie DuPriest Taylor, Dan Batson, Henry S. Eldridge, Lonnie Randolph and Kim Frederick, in their official capacities as members of the Board of Pardons and Paroles.<br><br>*Respondents* | Case No. xx-cv--- |

## DECLARATION OF SHIRENE HANSOTIA

I, Shirene Hansotia, hereby declare under penalty of perjury, that the following is true and correct to the best of my knowledge.

1. I am a public interest attorney who practices in South Carolina for the American Civil Liberties Union (ACLU) of South Carolina, specializing in criminal justice issues, particularly prison and jail

1

reform, and sentencing reform. I have multiple clients who are currently incarcerated in prisons across the state of South Carolina.

## Herbert Palmer, Jr.

2. I recently visited my client, Mr. Herbert Palmer, in-person at McCormick Correctional Institution on March 12, 2020. Mr. Palmer is forty-three (43) years old. I followed-up that meeting with a phone conversation meeting on April 15, 2020. My client's primary concern is his exposure to COVID-19 inside the facility, given that his underlying medical issues potentially make him more vulnerable to contracting COVID-19 and suffering serious complications as a result.

3. The McCormick Correctional Institution (MCI) is a state operated level 3 facility located approximately 75 miles southwest of Columbia in the town of McCormick, South Carolina. The facility was opened in 1987 and serves as one of South Carolina's adult male maximum-security correctional facilities. The reported capacity at McCormick is 1,108 and the average daily population during the last six months of 2017 was 990. One of the four 252-bed housing units was closed in November 2017 reducing the facility operational capacity to 856.

4. All of the housing units at McCormick contain secure cells as dormitory style housing is not available at this facility. All cells are equipped with beds and a toilet and washbasin. Showers are in a common area. In total there are six housing units at MCI. Mr. Palmer told me that he lives in the F4B housing unit in a double-occupancy cell within the McCormick Correctional Institution.

5. My in-person meeting took place on March 12 in a small conference room located in close proximity to the offices of several South Carolina Department of Corrections (SCDC) employees at McCormick prison. We shut the door for privacy and I was able to speak freely with Mr. Palmer about a variety of issues at length. COVID-19 was starting to dominate the news coverage but there had yet to be documented cases of the virus in most states at that time.

2

6. Mr. Palmer informed me that SCDC staff had not provided the incarcerated population at McCormick with any guidance or information regarding COVID-19 symptoms, the potential for contagious spread through the institution, or mitigation. In addition, Mr. Palmer shared that there was no hand sanitizer available anywhere on the yard, and no bleach or cleaning supplies had been provided for the purpose of cleaning cells and common areas. Mr. Palmer said that some families had donated funds for incarcerated men at McCormick to purchase cleaning supplies from the canteen; and that was the only material available at that time to sanitize the areas.

7. At this same time, SCDC had been publicly declaring that plentiful supplies of hand sanitizer, bleach and cleaning supplies had been distributed at every correctional institution, and that each incarcerated person had access to these items. SCDC was sharing its "COVID-19 Action Plan," and publicizing that it had trained and directed staff to educate the incarcerated population on how to prevent the spread of COVID-19.

8. Mr. Palmer informed me that he had severe gastrointestinal issues that began a few years ago and persisted to this day. He believed the cause, or at the very least, an aggravating factor, with these gastrointestinal issues was the low-quality and lack of nutritious food served to all incarcerated people across the state.

9. Mr. Palmer had sought medical treatment for these gastrointestinal issues beginning a few years ago. He had been seen by a gastroenterologist, and had undergone a colonoscopy and ultrasound procedure, in addition to being prescribed medication. He told me that the nurse who delivered his medication gave him no information about the purpose of the pills or about any potential side effects; and provided no instructions on how often to take the medication.

10. In addition to gastrointestinal issues, Mr. Palmer indicated he suffers from high blood pressure. At the time of this March 12th meeting, Mr. Palmer had not received his prescribed medication for high blood pressure for the past four months.

11. Mr. Palmer related to me that on one occasion, he had passed out in his cell for approximately 30 minutes as a result of his high blood pressure. He said that in spite of the fact that fellow incarcerated men were yelling for medical to come to his aid, it took at least 30 minutes for medical staff to arrive and assess his condition.

12. Mr. Palmer told me he feared for his safety, and the safety of others, particularly at nighttime and on weekends. He indicated that on most weekend shifts, there was typically one officer covering three dorms, altogether housing approximately 375 incarcerated men. According to Mr. Palmer, that meant that if any medical emergency arose, it could take 30 minutes to several hours for medical to respond. He told me that he had personally witnessed other men having seizures, heart attacks, cutting themselves and experiencing other medical emergencies waiting long periods of time for help to arrive while other men yelled and begged for assistance.

13. Mr. Herbert described the buildings at McCormick as being in a state of disrepair, including many busted pipes, and numerous clogged toilets and showers. He added that most of the showers he had access to were very dirty and covered in mold.

14. In my follow-up phone conversation with Mr. Palmer on April 15, 2020, he was feeling lethargic and sick. He relayed to me that he had first started experiencing symptoms on Friday, April 10th, when he came down with a fever and chills. He begged repeatedly to be seen by the medical staff, and was finally able to reach a nurse. She noted that his temperature was 101 degrees. At his request, she also checked his blood pressure and it was normal. Neither Mr. Palmer or his roommate were removed from the cell.

15. Several hours later into the day, after a shift change by the medical staff, Mr. Palmer yelled for help again until a different nurse stopped by. She documented his temperature as 101 again. Mr. Palmer told me he had asked the nurse if there was any record of his earlier interaction with medical staff, or any annotation that he should be monitored because of his high fever. Mr. Palmer told me the nurse said there was no documentation from the earlier medical crew regarding his case.

16. Mr. Palmer said a nurse dispensed approximately eight to ten Tylenol pills on Friday, instructing him to take a pill every eight hours. In addition, he told me that protective masks were finally issued to every incarcerated person at McCormick on that Friday.

17. Mr. Palmer added that they still had no access to hand sanitizer, and were only provided a limited supply of very watered down bleach for cleaning cells and common areas. He said that while they had been instructed that it was protocol for dorm workers to wipe down common areas with bleach every two hours, that directive was not being followed.

18. The following day, April 11, Mr. Palmer was seen by a nurse, and his temperature registered 102 degrees. He told me he was getting scared, and begging medical to help address the cause of his fever and other symptoms. He relayed to me that a nurse said, "You don't have the virus," even though Mr. Herbert had not been given a COVID-19 test, nor had medical staff done any more than a cursory examination of his symptoms. He told me no medical staff person asked him any questions about known COVID-19 symptoms, such as whether or not he had lost his sense of smell or taste. No medical staff had taken his blood pressure since the initial assessment on Friday.

19. Mr. Palmer said no one from the medical staff checked on him during Sunday, April 12th, during the day or night. He shared that the official logbook from April 12th would confirm that no one checked on him during that 24-hour period.

20. Mr. Palmer told me that during the period when he was suffering with a high fever and other serious medical symptoms, medical staff placed him on "quarantine" status, which meant he was kept locked in his cell with his roommate. He indicated that he was never moved to a medical unit, nor was his roommate removed from the cell to protect him from catching Mr. Palmer's illness. They were both kept in close quarters with other individuals who did not exhibit any symptoms.

## Brandon Moore

21. On April 15, 2020, I conducted a phone call meeting with Mr. Brandon Moore, who is based at Turbeville Correctional Institution. Mr. Moore is thirty (30) years old. Mr. Moore is past his parole eligibility date, but he is unable to have the parole board review his case for release because the Board has indefinitely suspended hearings during this pandemic. His release date is now less than six months away. In addition, Mr. Moore is concerned about his exposure to COVID-19 inside the facility, given that his underlying medical issues potentially make him more vulnerable to contracting COVID-19 and suffering serious complications as a result.

22. The Turbeville Correctional Institution (TCI) is a state operated level 2 facility located approximately 65 miles east of Columbia in the town of Turbeville, South Carolina. The facility was opened in 1994 and serves as one of South Carolina's adult male medium security correctional facilities. The current reported operating capacity at Turbeville is 1,377 and the average daily population during the last six months of 2017 was 1,030. One housing unit had been closed (October 2017) due in part to limited available staffing levels, temporarily reducing the current operating capacity of the facility. Mr. Moore said he is currently housed in the Elliot A housing unit.

23. Mr. Moore stated that he has had numerous medical issues during his incarceration period. Mr. Moore entered prison with a history of suffering seizures. He made SCDC medical staff aware of his condition when he began serving his sentence, and was prescribed medications to control the seizures.

24. In early fall, 2019, Mr. Moore was moved to Manning Correctional Institution, a low-security prison that offers re-entry programming and work-release programs. Mr. Moore was a part of the work release program at Manning, and given the privilege to leave the facility during daytime to work in the community. According to Mr. Moore, when he requested his seizure medications from Manning's medical staff, the nurse there told him he no longer needed the prescribed drugs. Mr. Moore said she refused to provide any more

medication, and stopped his drug regimen immediately without a weaning off process.

25. Mr. Moore was moved to McDougal Institution sometime in September, 2019. He stated that he had been taken off his medications for approximately seven days when he began experiencing light-headedness, blurred vision and other symptoms. He stated that he relayed his symptoms to a correctional officer and asked that he request medication be provided by medical staff. Mr. Moore said that his request was never relayed to medical staff.

26. Shortly thereafter, Mr. Moore said he passed out, hitting his head and suffering a concussion. His roommate returned to find Mr. Moore suffering a seizure. Eventually, Mr. Moore said the "A-team," the term used to refer to first-responders, came to assess his condition in his cell.

27. Mr. Moore said that SCDC medical determined his seizures were a result of his underlying high blood pressure. He was prescribed blood pressure medications and has not suffered any seizures since that date.

28. In addition to suffering from high blood pressure and seizures, Mr. Moore broke both hands on January 7, 2020. He endured a great deal of pain after the incident, and requested help from medical to get his hands x-rayed, re-set and placed in casts. He was not transported to Columbia's medical facility until February, where they took images of his fractures. According to Mr. Moore, he was provided with Ace bandages instead of hard casts. As a result, Mr. Moore said both hands have healed incorrectly. Mr. Moore said simple tasks such as clothing himself or bathing have been very difficult since the injuries.

29. Since the COVID-19 pandemic has dominated the news, Mr. Moore has been concerned about the possibility of catching the virus or passing it on to others. He said in spite of SCDC's contention that hand sanitizer will be provided, none has been dispensed at his unit. In addition, he estimated that bleach and cleaning supplies were provided every three weeks. He said that the men from his unit scramble to get their share of the supplies when they are issued, to

provide the best possible protection from spreading the virus. He added that each man was finally provided one mask on Friday, April 10th.

30. Mr. Moore said he met with a parole examiner to review his case in October 2019. He was recently provided with a parole hearing date of March 17, 2020, but was prevented from going before the parole board for consideration of release due to the Parole Board indefinitely suspending hearing dates during the pandemic. Mr. Moore's projected release date is less than six months away, on August 14, 2020.

### Allen Slaughter

31. On April 15, 2020, I conducted a phone call meeting with my client, Mr. Allen Slaughter, who is based at Allendale Correctional Institution. Mr. Slaughter is forty-eight (48) years old. Mr. Slaughter's primary concern is his exposure to COVID-19 inside the facility, given that his underlying medical issues potentially make him more vulnerable to contracting COVID-19 and suffering serious complications as a result.

32. Allendale Correctional Institution (ACI) is a medium-security, level 2 state prison for men located in Fairfax, Allendale County, South Carolina. The facility opened in 1989 and has a capacity of 1090 inmates. Mr. Slaughter said he lives in the Colleton B housing unit at ACI.

33. According to Mr. Slaughter he has suffered from severe asthma in childhood, and again as an older adult. Mr. Slaughter told me he has had to seek emergency room care multiple times for his asthma, and been hospitalized in New York, North Carolina and South Carolina for complications from asthma.

34. In March, 2020, SCDC issued it's "COVID-19 Action Plan," describing its approach to preventing COVID-19 from entering the prisons and mitigating its spread should individuals inside the prisons become sick from the virus. An addendum to this plan, "2019 Novel Coronavirus-HR Update," described categories of individuals identified by the Centers for Disease Control (CDC) and

the Department of Health and Environmental Control (DHEC) as high risk for contracting COVID-19. These groups included "people who have serious chronic medical conditions like heart disease, diabetes, and *lung disease.*" Mr. Slaughter's severe asthma puts him at a higher risk of catching the virus, as well as suffering life-threatening complications as a result.

35. Mr. Slaughter said cleaning supplies such as bleach have been passed out approximately once a week in his dorm. He described the bleach as being watered down significantly. Mr. Slaughter stated that while housing unit leaders are supposed to clean the common areas regularly, they often run out of cleaning supplies, leaving the men vulnerable in the meantime. He added that typically no cleaning is done in the evenings and on weekends, after SCDC management has left the institution.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 19th day of April 2020.

/s/ *Shirene Hansotia*

Shirene Hansotia
ACLU of SC